| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------x<br>In re:<br><br>United Marion LLC,<br>United Walton LLC,<br><br>                         Debtors.<br>------------------------------------------------------------x | Hearing Date and Time:<br>May 9, 2013 at 10:00 a.m.<br><br>Chapter 11<br><br>Case No. 11-11108 (SMB)<br>Case No. 11-11109 (SMB)<br><br>Jointly Administered |

### LENDERS' OBJECTIONS TO BIJAN DANIALIAN'S PURPORTED ACCOUNTING

**TO THE HONORABLE STUART M. BERNSTEIN,**
**UNITED STATES BANKRUPTCY JUDGE:**

       Walton Associates LLC and Bravo Realty Corp. (collectively the "Lenders") hereby submit this objection to the purported accounting forward by Bijan Danialian ("Mr. Danialian"), and represent and show this Court as follows:

### PRELMINARY STATEMENT

      1.      The Lenders previously moved to obtain reimbursement from Mr. Danialian for his improper use of cash collateral. (ECF No. 85). In response to this motion, and as a pre-requisite to a final ruling, the Court entered an Order on February 4, 2013 (the "Accounting Order") directing Mr. Danialian to provide a formal, verified and itemized accounting of all income and expenses relating to the two separate apartment buildings located at 2401-2463 Marion Avenue, Bronx, New York and 2435-2447 Walton Avenue, Bronx, New York (collectively, the "Buildings"). A copy of the Accounting Order is annexed hereto as <u>Exhibit</u> "A".

2. Mr. Danialian continues to play fast and loose with his obligations in bankruptcy and forwarded a package of miscellaneous schedules and incomplete copies of bank accounts that do not meet the requirements of the Court's order. In fact, his recent submissions settle no questions, but rather raise new ones.

3. Among other things, Mr. Danialian has disregarded this Court's express direction that the accounting be both verified and itemized. On the income side, Mr. Danialian provides no actual rent rolls or collection reports for the Buildings. Instead, we are left to guess as to which tenants paid rents, while noting that deposits into the DIP accounts amount to $1,194,535.96, as compared to budgeted receipts of $1,275,000, leaving the estates potentially short in collections of $80,464.04 [$1,275,000 - $1,194,535.96 = $80,464.04].

4. On the expense side, Mr. Danialian reports total disbursements of $1,172,152.68, of which the total sum of $506,532.92 was purportedly paid to individuals, as opposed to corporate payees, including some $102,000 paid to Mr. Danialian and his wife. These amounts significantly exceed budgeted expenses by at least $315,356.22[1].

5. Further, no written explanation has been provided as to why the reverse side of canceled checks, or the payroll records are still missing. We believe that this is <u>not</u> an oversight, but an obvious attempt by Mr. Danialian to cover his tracks and hide improper payments involving individuals.

---

[1] Under the cash collateral budget, all individual employees were budgeted a total of $247,411.45, including $32,500 for Mr. Danialian.

6. What can be further discerned is that (i) Mr. Danialian paid obligations of one company from the DIP account of the other; (ii) three professionals (Mark Cohen & Associates, Randy Willett, and Balsamo Rosenblatt) were paid a total of $27,150 despite not being retained pursuant to Order of this Court; (iii) another $15,000 in checks were made payable simply to "United Walton" without explanation; and (iv) some $10,675.75 was paid after confirmation of the Lenders' plan in July, 2012.

7. In short, based on the latest submissions, at least $315,356.22 appears to have been misused, itemized as follows:

| | |
|---|---|
| Overpayments to employees | $ 137,390.03 |
| Unidentified individuals | $ 55,640.44 |
| Unretained professionals | $ 27,150.00 |
| Payments to the Danialians/United Walton | $ 84,500.00 |
| Payments made after confirmation and sale | $ 10,675.75 |
| Total unexplained disbursements | $ 315,356.22 |

## THE ACCOUNTING IS DEFICIENT

8. The Accounting Order is very specific as to the scope and level of detail required of Mr. Danialian and provides, in relevant part as follows:

> **ORDERED**, that Bijan Danialian shall prepare and file a verified accounting (the Accounting"): (i) itemizing the Debtors' receipt of all rents, earned interest, cash collateral and other property of the estate during the entirety of the Chapter 11 cases separately for each building; and (ii) specifying the use and disposition of said rents, earned interest, cash collateral and other property of the estate separately for each building; and it is further
>
> **ORDERED**, that the Accounting shall also include all supporting documentation, including all ledgers, deposit slips, cancelled checks (front and back), bank statements, payroll, vendor bills and invoices . . . .

9.  By letter dated March 8, 2013, counsel for Mr. Danialian forwarded the substantially the same opaque list of disbursements that was previously produced, together with copies of bank statements for the DIP operating accounts, and certain invoices from vendors requesting payment of expenses from the Debtors. This production is collectively annexed hereto as Exhibit "B" (without the invoices).

10. There is no affidavit, verification nor, indeed, any writing whatsoever signed by Mr. Danialian attesting to the veracity of the documents, the completeness of the purported receipts and expenses, or providing an explanation of missing information.

11. While it appears that all of the DIP bank statements were produced, they contain copies only of the fronts of canceled checks, but not the backs, so that it is impossible to trace the actual flow of funds via endorsements.

12. Payments fall into two categories: those made to business entities, and those made to individuals. Invoices were provided for most, but not all of the payments made to businesses. Even presuming that the payments to businesses were legitimate despite the lack of complete documentation[2], over $530,000 worth of checks were paid to individuals without documentation, such as invoices or payroll records. Annexed hereto as Exhibit "C" is an itemized list of these checks, separated by payee, for which no documentation has been provided.

---

[2] Given the obvious problems with the individual payments, the Lenders are not currently challenging payments made to corporate payees, but reserve their rights in this regard.

4

13. Notably, $100,000 in checks were written directly to Mr. Danialian and a $2,000 check was paid to his wife. Two checks totaling another $15,000 were written to "United Walton" and presumably cashed by Mr. Danialian. These payments were never authorized and exceed the budgeted amounts by $84,500 [$117,000 - $32,500 = $84,500], which must be immediately returned to the Lenders as a start.

14. The basis for some of the individual payments can be justified as part of payroll that was approved under the April 28, 2011 Order authorizing the Debtors to use cash collateral, a copy of which is annexed hereto as Exhibit "D". However, because these "employee payments" substantially exceed budgeted amounts, the Lenders have long suspected that Mr. Danialian utilized the employees to siphon off cash collateral for his own benefit. (See ECF #91).

15. For example, the budget called for payments of $700 per month to be made to Ramon Molina, the superintendent at the United Marion property. Over the 65 weeks between the April 28, 2011 commencement of the budget and the July 28, 2012 confirmation of the plan, Mr. Molina should have been paid a total of $45,500. Conversely, the actual checks made payable to Mr. Molina total $107,320.48, without any meaningful explanation for this significant overpayment.

16. Similarly, Julio Colon was to be paid $333 per week as a porter, for a total of $21,645. The checks made payable to Mr. Colon total $74,682.

17. Checks totaling $61,400 were paid to Victor Payano, even though the budget provides for only $673.33 per week, or $43,766.45 for 65 weeks.

18.     Ana Rosa Nunez was to be paid $500 each week as the superintendent for the United Walton property. She was paid a total of $11,900[3] over a 14 week period. It is not clear why the payments stopped, but assuming the fourteen week period is correct, she should only have received $7,000 for 14 weeks of employment.

19.     The total amount of the checks payable to Luz Guecha is approximately correct, but the payments continued after the July 28, 2012 plan confirmation and did not stop until November 23, 2012, for total unauthorized payments of $4,610.

20.     Of the many checks written to individuals for non-budgeted expenses, two immediately stand out. Checks totaling $16,500 were paid to Mark Cohen and Associates, a Bronx landlord/tenant law firm that was never retained by Order of this Court. Similarly, checks in the amount of $18,650 were paid to Randy Willett, who appears to be an accountant in Hicksville, NY, who likewise was never retained by Order of this Court. Moreover, his services were never actually utilized since the Debtors failed to file any operating reports during the Chapter 11 cases.

21.     The balance of $55,640.44 in payments to 13 unidentified individuals remains a complete mystery, highlighted as follows:

---

[3] Although Ms. Nunez was an employee of United Walton, only one check, in the amount of $2,000 was paid by Walton. The other 9 checks, totaling $9,900 were paid by United Marion. No explanation has been provided for the failure to allocate the payments properly between the Debtors.

| Name | Amount |
|---|---|
| Carlos Dominican | $ 2,900.00 |
| Carlos Gallardo | $23,400.00 |
| Carlos Savinon | $ 2,250.00 |
| Domingo Mercedes | $ 2,500.00 |
| Faribourz M | $10,000.00 |
| John L Villanueva | $ 5,940.44 |
| Llano Roselio | $ 200.00 |
| M. Nunez | $ 150.00 |
| Morales Edwin Ramon | $ 450.00 |
| Rafael Gonzalez | $ 750.00 |
| Ramon Hernandez | $ 3,800.00 |
| Sosa Jose | $ 1,500.00 |
| Tulio Flores | $ 1,800.00 |

22. In sum, Mr. Danialian should be compelled to reimburse the Lenders for at least $315,356.22 for all of the reasons advanced throughout.

WHEREFORE, the Lenders request relief consistent with the foregoing, together with such other and further relief as is just and proper.

Dated: New York, New York
April 1, 2013

>                                GOLDBERG WEPRIN FINKEL
>                                GOLDSTEIN LLP
>                                Attorneys for the Lenders
>                                1501 Broadway, 21st Floor
>                                New York, New York 10036
>                                (212) 221-5700
>
>                                By: _____
>                                      Kevin J. Nash, Esq.

X:\GWFG\new data\Yen\word\Nehmadi - Bravo Realty (United Walton & United Marion) - NEHMA 29871\Objection to Accounting 04-01-13 (v3).doc

7